O’NIELL, J.
This suit is an attack upon the validity of the nuncupative last will and testament by public act of the late Francois Gruaz, dated the 29th of November, 1912. The contestant, Miss Justine Gruaz, is a sister of the decedent, claiming his estate as his universal legatee and executrix under a nuncupative testament by public act dated the 8th of July, 1909. The defendant, Miss Nellie Margaret Bradley, is the universal legatee and executrix named in the contested will.
The plaintiff alleges that the document purporting to be the last will and testament is invalid, because its recitals were not dictated by the alleged testator; she alleges that on the 29th of November, 1912, Francois Gruaz was so weak, physically and mentally, that he could not dictate anything; and she further alleges that Miss Bradley lived in open concubinage with Mr. Gruaz without after-wards being married to him, and that she is therefore incapable of receiving' any portion of his immovable property or more of the movables than a tenth of the value of his estate, by a testament valid in form. The defendant entered a general denial of all of the allegations in the contestant’s petition. After hearing the evidence on these issues, the district court decided that the formalities of the law were complied with, that the will was properly dictated, and that, although the legatee had lived in concubinage with the testator, it was not in that open and notorious concubinage which is condemned by our Civil Code. From the judgment rendered in favor of the defendant, the contestant has appealed.
Francois Gruaz died in the Touro Infirmary in New Orleans on Sunday, the 1st of December, 1912. I-Ie had been removed from his home on Dryades street, in this city, to the infirmary on Monday, the 25th of November, 1912, suffering with a disease which had affected his heart. He was operated upon, or tapped, for dropsy on Tuesday, the 26th of November. The testament which is attacked in this suit was written by a notary public in the presence of four witnesses in the patient’s ward in the infirmary on Friday, the 29th of November, 1912, at about 1 o’clock in the afternoon.
On the trial of this case the plaintiff proved by the testimony of four witnesses — others than those who had signed the testament as such — that Mr. Gruaz was physically and mentally too weak to dictate a will, or to hold a conversation at any time on the 29th of November, 1912. One of these witnesses was an attending physician in charge of that *322 ward in the infirmary. He testified that on the day the will was made Mr. Gruaz. was not conscious — that he was irrational — did not carry on any conversation with anybody, and would not reply when the doctor asked him how he felt. Another of these witnesses was a minister of the gospel who was at the bedside when .the notary arrived. He testified that Mr. Gruaz was too weak to carry on a conversation — that he could only answer in whispered monosyllables — and would not even say how he felt until the question had been put to him two or three times, and his attention was aroused by tapping him on the hand. This is the substance of the testimony of the four witnesses who saw Mr. Gruaz immediately before and after the making of the testament.
The defendant thereupon called each of the four witnesses who had signed the testament as such to testify to the manner in which the will was dictated. Without any apparent prejudice or favoritism, each one of these witnesses to the will frankly testified that Mr. Gruaz did not dictate anything while they were in the room, and while the notary was writing the testament.
The first of these witnesses, 'Michael P. Tusa, said that the notary asked Mr. Gruaz if he “was satisfied to leave everything to Miss Bradley,” to which Mr. Gruaz nodded his head. Then the judge took the examination of the witness in hand, with this result, viz.:
“Q. Did you hear anybody tell him [the notary] to write that down?
“A. No, sir: 1 did not.
“Q. You didn’t hear anybody tell him to write that down?
“A. No, sir.”
At another time, while this witness was being examined by the defendant’s counsel, the judge asked him:
“Now think a moment; did he [the testator] say anything to the notary?”
And the. witness replied;
“No; I didn’t hear him say anything of that.”
The judge then repeated the question and got the same answer. And at another stage of the examination in chief, the judge interrupted and asked why Mr. Gruaz had not signed the will; and the witness replied that they had asked him about three times to sign it, but he was so weak he could not sign.
We now quote the entire cross-examination of- this witness, viz.:
“Q. You say that Francois was too weak to sign his name?
“A. Yes, sir.
“Q. How do you know that?
“A. Because I was there to see that he was. He made two or three attempts to sign; but he couldn’t sign.
“Q. Did he say he was too weak to sign?
“A. No, sir; he didn’t say that, but he tried to sign, and he couldn’t sign.”
The second witness called for the defense was Frank Moray,, who had also signed as a witness to the will. We quote his testimony describing the proceedings, viz.:
“Q. Now relate to the court what happened, beginning at the beginning, and going right on through.
“A. Well, I was downstairs in the office, and I was asked to go up there and witness the will. When I got up there, the notary started to make out the will. He wrote the will — I don’t know just how it was — he wrote it out, and read it out to Mr. Gruaz. Mr. Gruaz acknowledged the will was all right, and he tried his best to sign his signature; but he couldn’t.
“Q. He couldn’t sign?
“A. No, sir; he -was too weak; he was dying then.
“Q. When the notary went to make out the will, was there anything written already in advance?
“A. No, sir; not at all.
“Q. He wrote it all right there?
“A. Yes, sir; right there in front of us.
“Q. Who told him what to put in the will?
“A. 1 couldn’t tell you anything about who told him what to put in the will.
“Q. You couldn’t tell anything about who told him what to put in the will?
“A. Nobody told him when I was there.
“Q. How did he know what to put in the will?
“A. Well, he must have been told before I got up there. He asked Mr. Gruaz, when he came to certain points, was it right, and Mr. Gruaz would acknowledge it and say it was right.”
*324 On cross-examination this witness also testified that Mr. Gruaz did not say he could not sign his name, or was too weak to sign. They knew he was too weak to sign because three of the witnesses held him up in the bed while they placed a fountain pen in his hand; but his hand was too weak to hold the pen.
The next witness, Thomas Picone, who had signed as a witness to the will, testified in his examination in chief that Mr. Gruaz told the notary that everything was to go to Miss Bradley. But on cross-examination he explained how this was done, viz.:
“Q. Was the notary asking questions — he answering the notary?
“A. He asked the questions. Everything he had what he left, he was telling, was for Margaret Bradley.
“Q. The notary asked Mr. Gruaz a question, and Mr. Gruaz answered?
“A. Yes, sir; he put his head down. [Witness nods his head.]
“Q. Put his head down?
“A. Yes, sir.
“Q. Nodded his head?
“A. Yes, sir.
“Q. Now, how do you know he was too weak to sign his name?
“A. Because they handed him the pen; he couldn’t hold the pen.
“Q. Did he say that he was too weak?
“A. No; he didn’t say. They tried to put the pen in his fingers, and he couldn’t hold the pen.
“Q. But he didn’t say anything?
No; then the notary made some more writing after, when he saw he couldn’t write.
“Q. And the notary put down some more writing and asked Mr. Gruaz whether that was correct ?
“A. Yes, sir.
“Q. And Mr. Gruaz nodded his head?
“A. Yes, sir; he say, ‘Yes, everything is all right.’ ”
The next witness for the defense was Mr. G. Hauser, the engineer in the Touro Infirmary, who had served as a witness to the will. He also stated in his examination in chief that Mr. Gruaz told the notary what to write in the will; but on cross-examination he gave the same explanation which the other three witnesses had given, viz.:
“Q. How do you know Mr. Gruaz was not able to sign it?
“A. I tried to raise him up, and he could not hold a pen to write; he just could hold the pen to make a cross.
“Q. That was the only reason?
“A. He was so weak.
“Q. Well, that’s the only reason you know he was too weak, because you had to hold him up?
“A. Yes, sir.
“Q. Do you remember what Gruaz said to the notary?
“A. Well, the notary asked him if that was his purpose, what he wanted to do with the will; he said, ‘Yes.’ ■
“Q. That’s all he said, just ‘Yes’?
“A. Yes, sir.
“Q. How did the notary know what to put in the will?
“A. Well, he asked Mr. Gruaz; Mr. Gruaz says, ‘Yes.’ ,
■“Q. In' what condition was Gruaz at that time?
“A. He was pretty weak. I think he had his senses, as far as I could see.
“Q. Did he carry on any conversation?
“A. No; none at all.”
Opposed to the testimony of the above-mentioned eight witnesses — four of whom were material witnesses called by the defendant — we have the testimony of a very prominent and worthy physician, who had been treating Mr. Gruaz during his last five years, and who testified that he examined his patient thoroughly on the 29th of November, 1912, at about 11 or half past 11 o’clock in the forenoon, and found him physically weak, but mentally sound and, in his opinion capable of making a will.
The notary public who wrote the will testified that he asked questions and gave explanations as he went along writing, but that Mr. Gruaz dictated the substance of what was written. There are some circumstances, however, which lead us to the belief that the memory of this witness was at fault. For example, he began his testimony by explaining that he wrote the name “Gruez,” instead of “Gruaz,” because the testator spelled the name out plainly for him, “G-r-u-e-z.” This is indeed remarkable, in view of the positive proof that Mr. Gruaz never before spelled his name “Gruez.” This is proven by the uncontradicted testimony of his intimate friends and *326 relations, by tbe signature on his checks and the name on the printed matter used in his business, by the spelling of the name by both Mr. and Mrs. Gruaz in their divorce proceedings, and, above all, by the fact that when he petitioned the court to enjoin his wife from using the name, of which he was then so solicitous, he spelled it “Gruaz.” Another remarkable circumstance is that the notary wrote the name of the legatee, “Margaret Bradley,” although Mr. Gruaz had always called her “Nellie”; her affectionate notes to him were signed “Nellie” or “N.”; and it seems that Mr. Gruaz and all her other acquaintances knew her only as “Nellie Bradley.”
Without any reflection upon the veracity of the notary or upon the opinion of the physician who examined Mr. Gruaz an hour and a half or two hours before this will was written, there is a vast preponderance of proof that this testament was not dictated by the testator in the manner required by article 1578 of the Civil Code, if, in fact, it was dictated at all. We also conclude, from this preponderance of proof, that the alleged testator did not declare that he was unable to sign his name, as is required by article 1579 of the Civil Code, when some cause hinders a testator from signing his name.
Having reached the conclusion that the document purporting to be the last will and testament of Francois Gruaz is not a valid testament, it is not necessary to decide whether there was any impropriety in his living with the alleged universal legatee from the 19th of September, 1911, to the 25th of November, 1912, or whether they lived together openly and notoriously.
For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed ; and it is therefore now ordered, adjudged, and decreed that the document purporting to be the last will and testament of Francois Gruaz (written Gruez) by public act dated the 29th of November, 1912, is invalid, void, and of no effect; and it is therefore further ordered, adjudged and decreed that the order of probate of said null testament, ordering its registry and execution, and ordering letters testamentary to issue to Margaret Bradley, and the letters of executorship, be, and they are now, annulled and revoked. It is therefore further ordered, adjudged, and decreed that these probate proceedings be remanded to the civil district court of the parish of Orleans to permit the contestant, Miss Justine Gruaz, to proceed with the probate, registry, and execution of the last will and testament of Francois Gruaz by public act dated the 8th of July, 1909. The defendant is to pay the costs incurred in this litigation in the district court and on appeal; the cost of opening and administering the succession are to await the final settlement of the succession.